**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| KEVIN SHIBILSKI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2020-CV-_____ |
| ) | |
| JAMES R. MOSS, ) | |
| SCOTT VON HADEN, ) | |
| BONITA DENNEE, ) | |
| THOMAS DRAKE, ) | |
| MICHELE McCREA ) | |
| LADYSMITH FEDERAL ) | |
| SAVINGS AND LOAN, a Federal Savings ) | |
| and Loan Institution, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT

**NOW COMES** the Plaintiff, Kevin Shibilski, by and through his attorneys, Johnson & Bell,

Ltd., and as and for his Complaint against the Defendants James Moss, Scott Von Haden, Bonita

Dennee, Thomas Drake, and Ladysmith Federal Savings and Loan, states as follows:

## PARTIES

1.      Plaintiff Kevin Shibilski is a resident of the State of Wisconsin currently residing

at 1501 Highland Drive, Merrill, Wisconsin 54452.

2.      Defendant James R. Moss is a resident of the State of Wisconsin currently resident

at W7918 Barnett Road, Ladysmith, Wisconsin 54848.

3.      Defendant Scott Von Haden is a resident of the State of Wisconsin currently

resident at 9421 Ellsworth Road, Tomah, Wisconsin 54660.

4.      Defendant Bonita "Bonnie" Dennee is a resident of the State of Wisconsin currently resident at 89 Count Road H, Phillips, Wisconsin 54555.

5.      Defendant Thomas Drake is a resident of the State of Georgia currently resident at 755 Downyshire Court, Lawrenceville, Georgia 30044.

6.      Defendant Michelle McCrea is a resident of the State of Wisconsin currently resident at 814 Miner Ave E, Ladysmith, WI 54848.

7.      Defendant Ladysmith Federal Savings and Loan is a Federal Savings and Loan Institution with its principle place of business at 119 W 4th Street N, Ladysmith, Wisconsin 54848.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

9.      Venue is proper in this judicial district pursuant to 18 U.S.C. § 1391 because all Defendants are subject to personal jurisdiction in this judicial district and reside in this district.

## COUNT I – FRAUDULENT INDUCEMENT
## AGAINST DEFENDANTS DRAKE, MOSS, AND DENNEE

10.     At all relevant times, 5R Processors, Ltd., ("5R") was a Wisconsin-based full-service computer and electronics recycling company. (*See* Executive Summary, September 17, 2012, attached hereto as Exhibit A).

11.     Until April 5, 2018, an action for relief on the ground of fraud was to be commenced within 6 years after the discovery of the facts constituting the fraud, per Wisc. Stat. § 893.93(1)(b).

12.     As changes to the statute of limitations are deemed a substantive legislative, they apply prospectively.

13.     Accordingly, the controlling statutory limitation period applicable to fraud claims which accrued prior to April 5, 2018, is six years.

2

14.     As part of its business, 5R collected and processed Cathode Ray Tube (CRT) Glass, previously the main component of televisions and computer monitors operating by cathode ray tube.

15.     Due to their high lead content, CRT glass and used CRTs are considered hazardous waste by the United States Environmental Protection Agency (the "EPA") under the Resource Conservation and Recovery Act, 42 U.S.C. §6901 *et seq.*

16.     CRT glass is subject to the RCRA's prohibition on speculative accumulation, which means that a recycler must prove to the EPA that it has recycled, or has transferred to a different site for recycling, at least seventy-five percent (75%) by weight or volume of the amount of CRT glass that it accumulated during the calendar year, commencing on January 1, per 40 CFR § 261.1(c)(8) and 50 FR 634.

17.     Prior to the proliferation of flat panel displays and Liquid Crystal Display (LCD) and Light-Emitting Diode (LED) televisions, which do not utilize CRT technology, CRT manufacturers paid electronics recyclers like 5R for recycled CRT glass, which could be re-used in the manufacturing process.

18.     CRT glass sales generated income for electronics recyclers like 5R. In 2004, the average price paid by manufacturers for recycled CRT glass was $205/ton. (*See* TRANSPARENTPLANET U.S. CRT Glass Management Report, dated December 5, 2012, attached hereto as Exhibit B, p. 18-19).

19.     As new display technology gained widespread utilization, CRT manufacturing significantly decreased, and manufacturers no longer had use for recycled CRT glass.

20.     The lack of demand for CRT glass led to a decrease in the resale price of recycled glass, and by 2012, electronics recyclers like 5R had to pay an average of $200/ton to recycle CRT glass.

21.     As a result of the increasing cost of recycling CRT Glass, in at least the time period from 2010-2012, 5R accumulated large amounts of CRT Glass for which it could not properly store or comply with the one-year disposal requirements proscribed by the RCRA under 40 CFR § 261.1(c)(8).

22.     5R's CRT glass accumulation problem was known to Defendant Drake. Defendant Dennee, and Defendant Moss. *(See* Deposition Transcript of Brody Piotrowski 4/18/19, attached hereto as Exhibit C, pp. 17:2-17; 27:24-28:6).

23.     In October of 2010, the Environmental Protection Agency received a citizen complaint letter from a former 5R employee which claimed that electronic waste, including broken CRT glass had been unlawfully dumped and stored in various locations,  including ditches, purpose-dug holes, and under the loading docks of 5R's facility located at 5R's storage facility in Catawba, Wisconsin. (*See* WIDNR Complaint, attached hereto as Exhibit D, p. 3).

24.     The EPA forwarded this complaint to the Wisconsin Department of Natural Resources for investigation. (Ex. D, p. 3).

25.     Following the October 2010 Complaint and subsequent investigation, the Wisconsin DNR, accompanied by Defendants Drake, Moss, and Dennee, met to excavate the loading dock area at the 5R facility.

26.     The Wisconsin DNR investigation uncovered capacitors and CRT glass buried under the loading docks, as well as unacceptably high levels of arsenic, PCBs, and the PAHs 2-methyl naphthalene and naphthalene in soil samples. (Ex. D, pp. 5-6).

27.     The CRT glass at the Catawba facility was intentionally buried at the direction of Defendant Drake.

28.     The CRT glass at the Catawba facility was buried with knowledge of both Defendants Drake and Dennee.

29.     5R engaged Ayres Associates to consult and execute remedial actions including removal of the illegally stored and buried CRT glass, removal of wastes, and disposal of contaminated groundwater, which was completed from 2011-2012.

30.     Evidence of the remedial actions was submitted to the WI DNR.

31.     WI DNR closed its case against 5R in or about July of 2013.

32.     In the time period from at least 2010-2012, 5R shipped CRT glass between its facilities in Wisconsin and Tennessee.

33.     5R shipped its CRT glass between facilities at the direction of Defendants Drake and Moss.

34.     Defendants Drake and Moss were aided by Defendant Dennee.

35.     5R shipped CRT glass between facilities in a deliberate attempt to circumvent the RCRA's one-year hazardous waste storage requirements contained within 40 CFR § 261.1(c)(8).

36.     Defendants Moss, Drake, and Dennee, in a deliberate attempt to hide 5R's continued violations of 40 CFR § 261.1(c)(8):

    a.  Falsified shipping labels to change receipt dates of CRT glass;

    b.  Hid CRT glass from regulators and inspectors;

    c.  Created fake shipping invoices to downstream vendors showing non-existent shipments of CRT glass which would otherwise have been stored for more than one year;

    d.   Created fake entries in 5R's internal inventory systems showing non-existent downstream shipping

    e.   Lied to Department of Natural Resources regulators regarding the location of all stored CRT glass.

37.    Around the year 2010, 5R began having significant financial troubles. (*See* Deposition Transcript of Lana Nelson, 4/18/19, attached hereto as Exhibit E, pg. 18).

38.    Also in 2010, Defendant Drake, then Chief Executive Officer of 5R, began to seek out outside investors to bring capital into the company through 5R's attorney, Stephen Willett. (Ex. E, pg. 18).

39.    Attorney Willet contacted Plaintiff Shibilski in an attempt to restructure 5R's significant debt through Plaintiff Shibilski's professional network and connections with the Wisconsin Economic Development Corporation and his employment with Dougherty Funding, LLC.

40.    When financing from the Wisconsin Economic Development Corporation, Dougherty Funding, LLC, and later Mid-Wisconsin Bank fell through, 5R, through Defendants Drake and Moss and Attorney Willett proposed a direct investment by Plaintiff Shibilski.

41.    5R offered Plaintiff Shibilski a salary, gradual stock ownership interest in 5R, and title of Chief Executive Officer in exchange for Plaintiff Shibilski's assumption of Defendant Drake's personal guarantees to company debt.

42.    In solicitation of Plaintiff Shibilski's investment in 5R, 5R created a business plan binder detailing company financials, provided profit and loss statements, balances sheets, and "investment numbers" which showed financial obligations, and short and long term debt. (*See* Investment Binder, parts 1 and 2, and investment numbers, attached hereto as Group Exhibit F).

43. Each of the documents presented to Plaintiff Shibilski contained material misrepresentations or purposefully omitted material facts, including but not limited to:

a. Profit and loss statements misrepresented past due rent expenses at 5R's Fritz Building location in Rusk County, WI, and its Gates Building, also located in Rusk County, WI, in amounts ranging from $1,658 to $117,000 per year;

b. Balance sheets misrepresented past due liabilities for rent at the Fritz and Gates buildings in the amount of at least $413,000;

c. The materials omitted the existence of over three-million pounds of stored CRT glass in its Morristown, Tennessee facility;

d. The materials omitted the existence of Defendants Moss, Drake, and Dennee's scheme to move CRT glass between facilities to avoid the one-year storage requirement of the RCRA;

e. The materials omitted the existence of illegally stored CRT glass in 5R's "Sunshine Building" located in Glen Flora, WI;

f. Misrepresented that 5R was in compliance with all RCRA stockpiling requirements.

g. Represented that outstanding payroll liabilities were approximately $315,000, when in fact, as shown by 5R's tax returns for the same period, the liabilities were over $587,000.00. (*See* Fiscal Year End 6/30/12 Tax Return, attached hereto as Exhibit G, pg. 8).

44. Plaintiff Shibilski entered into a Binding Letter of Intent with Defendant Drake and his wife, Jo Ann Drake, to acquire the Drakes' stock in 5R. (*See* Letter of Intent, attached hereto as Exhibit H).

45.     Plaintiff Shibilski relied on the materials provided by 5R in entering into the Binding Letter of Intent.

46.     Per the Letter of Intent, Plaintiff Shibilski was to obtain gradually increasing ownership in 5R in exchange for his assumption of the Drakes' personal guarantees on company debt. (Ex. H).

47.     In the Letter of Intent, the Drakes and 5R jointly and severally represented the following, in relevant part:

> The financial information provided to the Investors (i) is consistent with the books and records of the Company, (ii) is true, complete and accurate, (iii) has been prepared in accordance with historical accounting practices of the Company; and (iv) present fairly in all material respects the financial position, results of operations, and cash flows of the Company as of and for the periods ending on their dates…
>
> The Company owns or leases all assets sufficient for the conduct of its business as presently conducted. The tangible assets of the Company are free from material defects, have been maintained in accordance with the past practice of the Company, and generally accepted industry practices, and re suitable for the purposes for which the Company presently uses them…
>
> Except as disclosed to the Investors in connection with the approximately $300,000 of unpaid payroll taxes, and any related continuing unpaid tax amounts, fines or interest related to the same ("Payroll Tax Deficit"), the Company has fully and timely, properly and accurately filed all tax returns and reports required to be filed by them, including all federal foreign, state and local tax returns and estimates for all years and periods (and portions thereof) for which any such returns, reports or estimates were due. All such returns, reports and estimates were prepared in the manner required by applicable law in all material respects. Other than the Payroll Tax Deficit, (i) there are no pending assessments, or to the Company's knowledge, asserted deficiencies or claims for additional taxes that have not been paid, and (ii) there are no liens for taxes on any property or assets of the Company (other than liens for taxes not yet due and payable). There have been no audits or examinations of any tax returns or reports of the Company by any Governmental entity…

THERE IS NO ACTION, SUIT PROCEEDING OR
INVESTIGATION PENDING OR, EXCEPT FOR THE
CURRENT LITIGATION WITH SUPREME ASSET, INC. AND
ENVIRONMENTAL MONITORING PROGRAM AT THE
CATAWBA, WISCONSIN FACILITY, BY THE STATE OF
WISCONSIN DEPARTMENT OF NATURAL RESOURCES,
TO THE COMPANY'S KNOWLEDGE, CURRENTLY
THREATENED AGAINST THE COMPANY OR ANY OF ITS
RESPECTIVE PROPERTIES OR ASSETS (I) THAT MAY
IMPAIR THE RIGHT OR ABILITY OF THE COMPANY TO
CARRY ON ITS BUSINESS AS NOW CONDUCTED OR AS
PROPSED TO BE CONDUCTED, OR (II) THAT QUESTIONS
THE COMPANY'S ABILITY TO CONSUMMATE THE
TRANSACTIONS CONTEMPLATED BY THIS BINDING
LETTER OF INTENT, OR (III) THAT, IF ADVERSELY
DETERMINED, WOULD HAVE A MATERIAL ADVERSE
EFFECT, AND TO THE COMPANY'S KNOWLEDGE, THERE
IS NO BASIS FOR ANY OF THE FOREGOING, THERE IS NO
ACTION, SUIT, PROCEEDING OR INVESTIGATION BY THE
COMPANY CURRENTLY PENDING OR WHICH THE
COMPANY INTENDS TO INITIATE.

(Ex. H, pp. 5-7).

48.    The Letter of Intent contained multiple misrepresentations by the Drakes and 5R

including, but not limited to:

     a.  The financial information provided to Plaintiff Shibilski was not consistent with the

       books and records of the Company, was not true, complete, or accurate, and did not

       fairly present all material respects of the financial position of the company;

     b.  The tangible assets of the company were not free from material defects;

     c.  5R owed substantially more in payroll and other taxes than were disclosed to

       Plaintiff Shibilski;

     d.  At the time of the disclosure, there were pending assessments, deficiencies, and

       claims for additional unpaid taxes aside from the Payroll Tax Deficit;

e.  Based on Company and Defendant Drake's prior experience with the Wisconsin DNR regarding the Catawba facility, Defendant Drake knew that 5R's illegal movement of CRT glass for the express purpose of avoiding the one-year holding period under the RCRA was a valid basis for an action, suit, proceeding or investigation by the relevant Department of Natural Resources, in direct contravention of the Drakes' and 5R's representation that "there is no basis" for any such action.

49.  Further relying on the misrepresentations contained within the Letter of Intent, Plaintiff Shibilski entered into the agreement on March 1, 2013, and thereupon became Chief Executive Officer of 5R and acquired 15% of 5R's corporate stock. (Ex. H).

50.  Defendant Drake and Moss made the misrepresentations with the intention to induce Plaintiff Shibilski to enter into the Binding Letter of Intent.

51.  Plaintiff Shibilski did not become aware of the stored and transported CRT glass until he personally visited 5R's facility in Morristown, Tennessee in December of 2014 and saw the glass for himself.

52.  The fraud committed by Drake and Moss was extraneous to the terms of the contract.

53.  As a result of Plaintiff Shibilski's reliance on the misrepresentations and subsequent agreement to the Letter of Intent, Plaintiff became personally liable for the debts of 5R.

54.  Plaintiff suffered direct pecuniary loss due to his assumption of the debts of 5R.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court compensate Plaintiff in an amount commensurate with his direct pecuniary losses suffered as a

result of his reliance of Defendants' misrepresentations, and grant any other such relief as this Court deems appropriate.

## COUNT II – RESCISSION
## EQUITABLE REMEDY

55.     Plaintiff restates and realleges paragraphs 1-53 as though fully set forth herein.

56.     Because Plaintiff's agreement was based on material misrepresentations by Defendants Drake and Moss, the Letter of Intent is voidable under Wisconsin law.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court VOID the Binding letter of Intent entered into as a result of his reliance of Defendants' misrepresentations, rescind the guarantees of the Binding Letter of Intent, and grant any other such relief as this Court deems appropriate.

## COUNT III – FRAUDULENT INDUCEMENT
## AGAINST DEFENDANTS MOSS, VON HADEN,
## AND LADYSMITH FEDERAL SAVINGS AND LOAN

57.     Prior to March 1, 2013, Defendant Moss had overdrawn 5R corporate accounts at Wells Fargo and Defendant Ladysmith Federal Federal Savings and Loan, as well as various other corporate banking accounts.

58.     Information regarding Defendant Moss's overdrafts was not reflected on any documentation provided to Plaintiff Shibilski prior to March 1, 2013.

59.     Defendant Moss's overdrafts totaled tens of thousands of dollars.

60.     Despite his role as Chief Executive Officer, Plaintiff Shibilski did not maintain control over 5R's finances, operations, or checking accounts.

61.     Defendant Moss retained control over all finances, operations, and checking accounts until the time he left 5R in 2016.

11

62.     In this capacity, Defendant Moss failed to adequately pay 5R's payroll tax liabilities to the IRS.

63.     In October of 2014 5R received a notice from the IRS which calculated that, according to the June 30, 2014 Form 941, 5R owed $175,347.00 in payroll taxes. (*See* Notice, attached hereto as Exhibit I).

64.     Despite efforts by Plaintiff Shibilski to restructure 5R's business and increase income, 5R continued to struggle financially throughout 2013 and 2014, resulting in its inability to maintain the payment plan it had entered into regarding its past due tax liabilities.

65.     In October of 2014, in an effort to resolve 5R's outstanding tax liabilities, Plaintiff Shibilski hired an outside consultant, Tax Guard, who specializes in IRS payroll tax liabilities, to assist 5R in its dealings with the Internal Revenue Service.

66.     5R negotiated with Defendant Ladysmith Federal for a loan to refinance 5R's debt.

67.     As part of this loan, Defendant Ladysmith Federal, through Defendant Scott Von Haden, required Plaintiff Shibilski to sign an unlimited personal guarantee as the CEO of 5R.

68.     By February of 2015, the loan amount to refinance 5R's debts totaled approximately $690,000. (*See* Loan Statement and Guarantee, attached hereto as Exhibit J).

69.     Prior to February 2, 2015, Defendant Moss, with the knowledge and assistance of Defendant Ladysmith Federal and Defendant Von Haden, had overdrawn company accounts in the amount of approximately $149,000.

70.     Defendant Moss's continued overdrafts were kept from Plaintiff Shibilski, but known to Defendants Moss, Von Haden, and Ladysmith Federal.

71.     By the time Defendants Moss and Von Haden informed Plaintiff Shibilski of the overdrafts the overdraft amounts had risen to $349,000. (*See* Partial Bank Statements, attached hereto as exhibit K).

72.     Plaintiff Shibilski was notified of Defendant Moss's overdrafts approximately five weeks after Plaintiff Shibilski had personally guaranteed 5R's debt.

73.      To cover Defendant Moss's overdrafts of the 5R accounts, Plaintiff Shibilski arranged financing through another company he owned, Wisconsin Logistics Solutions, which would purchase 5R's trucking platform for a price of $300,000.

74.     Under Plaintiff Shibilski's proposed solution Wisconsin Logistics Solutions would purchase 5R's trucking platform for $300,000, secured by a certificate of deposit of a Wisconsin Logistics Solutions investor, and Defendant Ladysmith Federal would loan the remaining $49,000 to 5R. (*See* Correspondence from Ladysmith Federal, attached hereto as Exhibit L).

75.     However, after the transaction was completed, Defendant Ladysmith Federal accepted the $300,000 payment, but refused to apply it to the overdraft amount, and never completed the $49,000 loan to 5R.

76.     Ladysmith Federal's refusal to apply the payments to the overdraft amounts directly impacted 5R's ability to satisfy its debts and therefore increased the amount of debt that Plaintiff Shibilski had personally guaranteed.

77.     Further, Defendant Von Haden and Defendant Moss intentionally concealed the existence of the overdrafts.

78.     Defendants Von Haden and Moss intentionally concealed the overdrafts to induce Plaintiff Shibilski to enter into the loan agreement and guarantee.

79.     The overdrafts were extraneous to the terms of the loan guarantee.

13

80.     Plaintiff Shibilski suffered direct pecuniary harm as a result of Defendant Moss and Von Haden's intentional concealment of the overdrafts.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court VOID the Guarantee entered into on February 2, 2015, compensate Plaintiff in an amount commensurate with his direct pecuniary losses suffered as a result of his reliance of Defendants' misrepresentations, and grant any other such relief as this Court deems appropriate.

## COUNT IV – RESCISSION
## EQUITABLE REMEDY

81.     Plaintiff restates and realleges paragraphs 57-80 as though fully set forth herein.

82.     Because Plaintiff's agreement was based on material misrepresentations by Defendants Moss and Von Haden, the Letter of Intent is voidable under Wisconsin law.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court VOID the Guarantee entered into on February 2, 2015 as a result of his reliance of Defendants' misrepresentations, rescind the Guarantee, and grant any other such relief as this Court deems appropriate.

## COUNT V – BREACH OF FIDUCIARY DUTY
## AGAINST DEFENDANTS MOSS, DENNEE,
## VON HADEN, LADYSMITH FEDERAL, AND MCCREA

83.     In June of 2014, Attorney Willett advised Plaintiff Shibilski to create a "sister company" to 5R focusing on glass recycling operations called Pure Extractions, Inc.

84.     Attorney Willett drafted incorporation documents and created Pure Extractions, Inc., with Plaintiff Shibilski as Chief Executive Officer and Defendant Moss as Chief Financial Officer. (*See* Pure Extractions Articles of Incorporation, attached hereto as Exhibit M).

85.     Defendant Moss retained full control over all Pure Extraction, Inc. bank accounts.

14

86.     From September 2015 to June 2016 Defendant Moss again overdrafted Pure Extractions, Inc.'s company accounts.

87.     From September 2015 to June 2016 Defendant Moss skimmed money by way of fraudulent ATM withdrawals.

88.     From September 2015 to June 2016 Defendant Moss engaged in a practice known as "check kiting".

89.     From September 2015 to June 2016 Defendant Moss fraudulently deposited business checks into his personal account.

90.     From September 2015 to June 2016 Defendant Moss misappropriated money from Pure Extractions, Inc. accounts through fraudulent counter withdrawals.

91.     From September 2015 to June 2016 Defendant Moss engaged in each of the behaviors listed above with the knowledge and acquiescence of Defendant Ladysmith Federal.

92.     While misappropriating Pure Extractions' financial accounts, Defendant Moss was also conspiring with Defendant Dennee, Defendant Ladysmith Federal, and Defendant Von Haden to set up a new company, PXL, Inc.

93.     Defendants conspired to establish PXL, Inc. as a competitor to 5R, Pure Extractions, Inc., and Wisconsin Logistics Solutions as early as March of 2016. (*See* Communications between Defendant McCrea and attorney William Milne, attached hereto as Exhibit N).

94.     Defendants each agreed, in furtherance of said conspiracy, to purposefully conceal their actions from Plaintiff Shibilski. (Ex. C at 46:24-47:4;

95.     Defendants conspired to steal inventory, cash, and equipment from Pure Extractions and 5R, as well as to avoid confidentiality agreements and appropriate 5F's customer database.

96.     Defendants acted, in furtherance of the conspiracy, without the knowledge of Plaintiff Shibilski. (Ex.C at 46:14-47:10).

97.     Defendants submitted profit and loss statements from Pure Extractions to the Rusk County Joint Finance Committee to obtain favorable leasing terms on a building to be used for PXL, Inc., which was previously leased to 5R (*See* Communication to Rusk County, attached hereto as Exhibit O).

98.     Defendants submitted projected income figures for PXL, Inc. built completely using Pure Extractions, Inc.'s figures, while never disclosing to Plaintiff Shibilski that PXL, Inc. existed or intended to subsume Pure Extractions' operations. (*Id.*)

99.     Concurrently, Defendants sought a line of credit through Defendant Ladysmith Federal, with the approval and direct involvement of Defendant Von Haden, to finance the start up of PXL, Inc. (*See* Communication between Michelle McCrea and Scott Von Haden, Ex. N).

100.    At the time Defendants sought a line of credit through Defendant Ladysmith Federal, Defendant Von Haden had full knowledge that PXL was being set up to steal the assets and customers of 5R and Pure Extractions.

101.    In June of 2016 Defendants Moss left 5R and Pure Extractions to work for PXL, Inc.

102.    In June of 2016, Defendant Moss converted 5R and Pure Extractions' assets including equipment, office furniture, documents, and customer databases, to PXL, Inc.

103.    Additionally, Defendants stole over $300,000 of Pure Extractions, Inc. corporate profits to fund operations at PXL. (*See* Pure Extractions Profit and Loss Statement, attached hereto as Exhibit P).

104.    Plaintiff Shibilski had no knowledge of the existence of PXL, Inc. until Defendant Moss left 5R and Pure Extractions and converted their assets for use at PXL.

105.    Defendant Moss, in conjunction with unknown additional Defendants, appropriated Pure Extraction and 5R equipment by issuing false credit memos which vastly understated the value of the appropriated assets. (*See* Credit Memos, attached hereto as Exhibit Q).

106.    As a result of Defendants' breach of their fiduciary duties to Plaintiff, Plaintiff Shibilski suffered direct pecuniary harm as a result of Defendants' theft of 5R's equipment, cash, assets, and customer database.

107.    Defendants' actions left Plaintiff Shibilski personally responsible for 5R's corporate debt with no assets to run the company.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court compensate Plaintiff in an amount commensurate with his direct pecuniary losses suffered as a result of his reliance of Defendants' breach of fiduciary duty, and grant any other such relief as this Court deems appropriate.

## COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACT
## AGAINST DEFENDANT LADYSMITH FEDERAL SAVINGS AND LOAN

108.    Due in part to Defendants' theft of 5R assets and customers, 5R became unable to meet its obligations and defaulted on its debt owed to Ladysmith Federal.

109.    Ladysmith Federal then brought suit against Plaintiff Shibilski as the personal guarantor of 5R's corporate debt following the February 2, 2015 refinancing agreement. (*See* Complaint, attached hereto as Exhibit R).

110.    Plaintiff Shibilski settled the case in exchange for an up-front payment of $50,000, plus an additional payment of $100,000, spread out over six years, secured by mortgages against Plaintiff Shibilski's properties. (*See* First Ladysmith Federal Settlement Agreement, attached hereto as Exhibit S).

111.    The original agreement stated that after payment of $75,000 following the initial $50,000 payment, Ladysmith Federal would execute a satisfaction of judgment and release of claims which would unencumber Plaintiff Shibilski's property. (*Id.*).

112.    Unbeknownst to Plaintiff Shibilski, Defendant Ladysmith shared Plaintiff Shibilski's financial disclosure with the Wisconsin Department of Workforce Development.

113.    The Wisconsin Department of Workforce Development then asserted liens on property owned by Plaintiff Shibilski for the back taxes owed by 5R.

114.    The liens were a direct result of Defendant Ladysmith's disclosure of Plaintiff Shibilski's personal financial statements.

115.    The Wisconsin Department of Workforce Development eventually began foreclosure proceedings on Plaintiff Shibilski's house.

116.    Plaintiff Shibilski arranged for a buyer for his house to cover his obligations to the Wisconsin Department of Workforce Development.

117.    Under the terms of the agreement, Plaintiff Shibilski took only a $6,000.00 profit on the sale of his house, rented the house back from the buyer, and retained the option to purchase the house back at twice the price it sold for.

118.    After executing the settlement agreement with Ladysmith Federal, Plaintiff Shibilski intended to sell other real property to satisfy the judgment. However, because of the encumbrances, he could not convey clean title sufficient to effectuate the real estate closings.

18

119.    Plaintiff Shibilski and Ladysmith Financial agreed to enter into a first amended settlement agreement which would release specific property to allow sale.

120.    Defendant Ladysmith Financial refused to extend the amended settlement terms to any additional properties.

121.    Because of Ladysmith's refusal to extend the release to any of Plaintiff Shibilski's additional properties, the previously agreed-upon sale of Plaintiff Shibilski's property located in Vilas County, Wisconsin fell through, and Plaintiff was forced to re-list the property.

122.    Ladysmith Federal eventually agreed to enter into a partial release agreement, but the sale of the property did not close until over one year later, at an approximately $25,000 discount.

123.    As a result of Defendant Ladysmith Federal's delay, Plaintiff Shibilski suffered a direct loss to Plaintiff Shibilski caused by Ladysmith's interference with his agreed-upon sale contract.

124.    Thereafter, Plaintiff Shibilski desired to sell real property located in Price County, Wisconsin, and enter into a second amended settlement agreement to effectuate this sale.

125.    Defendant Von Haden agreed to execute a second amended settlement agreement to allow the sale to proceed.

126.    However, Defendant Ladysmith again refused to timely negotiate the amended settlement, which caused the Price County sale to fall through.

127.    After Ladysmith Federal eventually relented and executed the second amended settlement agreement, Plaintiff Shibilski was able to salvage the Price County real property sale.

128.    To sell the property, Plaintiff Shibilski was forced to lower the sale price by $30,000-$40,000, a direct financial loss to Plaintiff Shibilski caused by Ladysmith's interference with his agreed-upon sale contract.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court compensate Plaintiff in an amount commensurate with his direct pecuniary losses suffered as a result of Defendants' tortious interference with his real estate contracts, and grant any other such relief as this Court deems appropriate.

## COUNT VII – BREACH OF FIDUCIARY DUTY – CONSPIRACY AGAINST DEFENDANT LADYSMITH FEDERAL SAVINGS AND LOAN

129.    In addition to the settlement reached with Plaintiff Shibilski in the lawsuit referenced in paragraph 110 above, Defendant Ladysmith Financial was also awarded a judgment of replevin on certain assets owned by 5R.

130.    5R received notices of tax liens for property on July 7, 2015 and December 22, 2015, and a notice of levy on January 20, 2016. (*See* Notices, attached hereto as Group Exhibit T).

131.    Per the judgment, Defendant Ladysmith Federal was to liquidate the replevined assets of 5R and apply the net proceeds to, in recognition of the rights of the United States of America, to the obligations due to Defendant Ladysmith Federal (*See* Judgment, attached hereto as Exhibit U, p. 18).

132.    The Internal Revenue Service liens and levies gave the United States of America first-priority lienholder status on the replevined 5R assets.

133.    On March 23, 2016, Plaintiff Shibilski, through counsel, notified Defendant Ladysmith Federal of the IRS's priority lien position on the replevined assets.

134.    Defendant Ladysmith Federal did not liquidate the replevined assets.

135.    Defendant Ladysmith Federal instead leased the replevined assets of 5R back to the new company, PXL, Inc.

136.    Defendant Ladysmith Federal's worked in conjunction with defendants Moss, Dennee, Von Haden, and McCrea to lease the replevined assets to PXL, Inc.

137.    Defendant Ladysmith Federal conspired with defendants Moss, Dennee, Von Haden, and McCrea to breach same's fiduciary duties to Plaintiff.

138.    Defendant Ladysmith Financial's failure to liquidate the replevined assets and satisfy its obligations to the Internal Revenue Service increase the amount due and guaranteed by Plaintiff Shibilski personally.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court compensate Plaintiff in an amount commensurate with his direct pecuniary losses suffered as a result of Defendant's Conspiracy to Breach Fiduciary Duty, and grant any other such relief as this Court deems appropriate.

## <u>COUNT VIII – RICO § 1962(c)</u>

139.    Plaintiff incorporates the allegations contained in paragraphs 1-138 as though fully set forth herein.

140.    This Count is directed at all Defendants

141.    5R Inc. was, at all relevant times, an enterprise engaged in and whose activities affected interstate commerce.

142.    Pure Extractions, Inc. was, at all relevant times, an enterprise engaged in and whose activities affected interstate commerce.

143.    PXL, Inc., was, at all relevant times, an enterprise engaged in and whose activities affected interstate commerce.

144.    All Defendants were either employed or associated with 5R Inc., Pure Extractions Inc., and PXL, Inc.

145.    The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically:

a.    Defendants knowingly founded PXL, Inc., as a direct competitor to both 5R Inc. and Wisconsin Logistics Solutions for the purpose of leaving Plaintiff Shibilski with 5R's debt;

b.    Concealed the founding of PXL, Inc. from Plaintiff;

c.    Misappropriated assets of 5R, Inc., Pure Extractions, Inc., and Wisconsin Logistics Solutions for use at PXL, Inc.;

d.    Violated confidentiality agreements to wrongfully appropriate customer lists for the sole purpose of stealing customers from 5R to PXL, Inc.;

e.    Intentionally concealed debts and unlawful acts of 5R from Plaintiff for the sole purpose of inducing Plaintiff to personally guarantee the debts of 5R;

f.    Misused funds meant to pay down debts for the sole benefit of Defendants to the direct detriment of Plaintiff.

146.    Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of wire fraud, financial institution fraud, theft of trade secrets, and hazardous waste violations.

147.    The acts of wire fraud, financial institution fraud, theft of trade secrets, and hazardous waste violations set forth in paragraphs 1-133 above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

148.     The Count VIII Defendants have directly and indirectly conducted and participated in the conduct of the enterprises' affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

149.     As a direct and proximate result of the Count VIII Defendants' racketeering activities and violations of 18 U.S.C. § 1962 (c), Plaintiff has been injured in his business and personal property in the ways stated above.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court Enter judgment against the Count VIII Defendants in the amount of Plaintiff's actual damages suffered, treble damages, and attorneys' fees and costs, and grant any other such relief as this Court deems appropriate.

## COUNT IX – RICO § 1962(a)

150.     The allegations of paragraphs 1 through 138 are hereby realleged and restated as though fully set forth herein.

151.     This Count is directed against all defendants.

152.     5R Inc. was, at all relevant times, an enterprise engaged in and whose activities affected interstate commerce.

153.     Pure Extractions, Inc. was, at all relevant times, an enterprise engaged in and whose activities affected interstate commerce.

154.     PXL, Inc., was, at all relevant times, an enterprise engaged in and whose activities affected interstate commerce.

155.     All Defendants were either employed or associated with 5R Inc., Pure Extractions, Inc., and PXL, Inc.

156.    The Count IX Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise.

157.    Specifically, Defendants conspired to steal cash, assets, and valuable customer and confidential data from 5R and Pure Extractions, Inc. to PXL, Inc., which was then invested in the startup of PXL, Inc., and utilized to derive income to Defendants and leave Plaintiff responsible for the debts of 5R, Inc.

158.    The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961 (5).

159.    As a direct and proximate result of the Count IX Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in his business and personal property from the loss of 5R and Pure Extractions business to PXL, Inc., as a result of Defendants' investment in the illegally received funds.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court Enter judgment against the Count IX Defendants in the amount of Plaintiff's actual damages suffered, treble damages, and attorneys' fees and costs, and grant any other such relief as this Court deems appropriate.

## COUNT X – RICO § 1962(b)

160.    The allegations of paragraphs 1 through 138 are hereby realleged and restated as though fully set forth herein.

161.    This Count is directed against all defendants.

162.    5R Inc. was, at all relevant times, an enterprise engaged in and whose activities affected interstate commerce.

24

163.    Pure Extractions, Inc. was, at all relevant times, an enterprise engaged in and whose activities affected interstate commerce.

164.    PXL, Inc., was, at all relevant times, an enterprise engaged in and whose activities affected interstate commerce.

165.    All Defendants were either employed or associated with 5R Inc., Pure Extractions, Inc., and PXL, Inc.

166.    The Count X Defendants acquired and maintained interests in and control of the PXL, Inc. enterprise through a pattern of racketeering activity.

167.    Specifically, Defendants conspired to steal cash, assets, and valuable customer and confidential data from 5R and Pure Extractions, Inc. to PXL, Inc., which was then invested in the startup of PXL, Inc., and utilized to derive income to Defendants and leave Plaintiff responsible for the debts of 5R, Inc.

168.    The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

169.    The Count X Defendants have directly and indirectly acquired and maintained interests in and control of the PXL, Inc., enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

170.    As a direct and proximate result of the Count X Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in his business and personal property by the loss of all assets of 5R including cash, equipment, fixed assets, and intangible assets, crippling its ability to conduct business.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court

Enter judgment against the Count VIII Defendants in the amount of Plaintiff's actual damages suffered, treble damages, and attorneys' fees and costs, and grant any other such relief as this Court deems appropriate.

## COUNT XI – RICO § 1962(d)

171.    The allegations of paragraphs 1 through 170 are hereby realleged and restated as though fully set forth herein.

172.    This Count is directed against all defendants.

173.    As set forth above, the Count XI Defendants agreed to conspire and violate 18 U.S.C. § 1962(a), (b), and (c), as set forth in Counts VIII, IX, and X, above.

174.    The Count XI Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Count XI Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes above. That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(a), (b), and (c), in violation of 18 U.S.C.  1962(d).

175.    As a direct and proximate result of the Count XI Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in his business and personal property in the ways enumerated above.

176.    Plaintiff Shibilski became aware of the depth and scope of the conspiracy to commit the acts enumerated in counts VIII, IX, and X, above, through written discovery in a civil case which proceeded in 2019.

WHEREFORE, Plaintiff Kevin Shibilski hereby demands that this honorable Court

Enter judgment against the Count XI Defendants in the amount of Plaintiff's actual damages

suffered, treble damages, and attorneys' fees and costs, and grant any other such relief as this Court

deems appropriate.

Respectfully submitted,

KEVIN SHIBILSKI

By:   */s/ Mark Belongia*
One of His Attorneys

Mark D. Belongia (belongiam@jbltd.com)
Daniel R. Ahasay (ahasayd@jbltd.com)
JOHNSON & BELL, LTD.
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
312-372-0770
*Attorneys for Plaintiff*